IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 10-00335-01-CR-W-DGK |
| LATIKA LYNN NELSON, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

On August 3, 2011, defendant filed a motion for a judicial determination of mental competency (document number 14). In support of that motion, defendant states in part as follows:

> 1.      On December 7, 2010, a two count indictment was filed in the Western District of Missouri charging that defendant knowingly and maliciously convey[ed] false information 18 U.S.C. §844(e), [and] defendant knowingly conveyed false information in violation of 18 U.S.C. §35(b).

> 2.      On January 25, 2010 the Federal Public Defender's Office was appointed to represent [Ms.] Nelson.

> 3.      On January 25, 2008 defendant appeared before the Honorable Robert E. Larsen, United States Magistrate Judge for initial appearance and arraignment. Through counsel, Ms. Nelson entered a plea of not guilty. The court did not detain Ms. Nelson.

> 4.      Counsel has met with Ms. Nelson personally on numerous occasions and has had several telephone conversations with her. During counsel's interaction he has observed that Defendant has difficulty reasoning and clearly understanding aspects of the case. Counsel has observed that Defendant has difficulty staying focused and interacting. Recently, counsel has verified through records that Ms. Nelson receives social security disability for numerous reasons related to mental and physical issues. Among her physical issues, Ms. Nelson suffers from [congenital] heart failure, osteoarthritis, asthma and hearing loss and is currently dependent on a wheel chair to get around. Specifically related to mental health issues, counsel has learned that Ms. Nelson has been prescribed medication for adjustment disorder with depressed mood

and dependent personality disorder. Additionally, counsel learned that Ms. Nelson was determined to have an IQ of 54 and was diagnosed with moderate mental retardation.

On August 17, 2011, I entered an order directing defendant to be examined on September 14, 2011, at the office of John Wisner, M.D., providing both the address and telephone numbers in the event defendant needed assistance with directions to Dr. Wisner's office. Defendant failed to show up for the appointment.

On September 15, 2011, I held a hearing on defendant's failure to appear at Dr. Wisner's office as directed. Defendant's appointment was rescheduled for September 28, 2011, and defense counsel and Pretrial Services were directed to assist defendant in getting to this appointment.

On November 7, 2011, Dr. Wisner requested authorization to conduct additional testing. That request was granted in an order dated November 18, 2011. Defendant was ordered to appear at Dr. Wisner's office for the follow-up exam on December 14, 2011 (document number 20).

Dr. Wisner prepared a written report which was filed under seal on February 28, 2012 (document number 22). A supplemental psychiatric report was filed under seal that same day (document number 23).

On March 28, 2012, I held a competency hearing. Defendant appeared in person, represented by Assistant Federal Public Defender William Raymond. The government was represented by Assistant United States Attorneys Dan Stewart and Brian Casey. The government called John Wisner, M.D., and Albert Buddy Poje, Ph.D., as witnesses, and their reports were adopted as their direct testimony. The government presented the following exhibits:

2

P. Ex. 1        Curriculum Vitae of Dr. John Wisner

P. Ex. 2        Psychiatric Evaluation dated February 10, 2012

P. Ex. 3        Curriculum Vitae of Dr. Albert Buddy Poje

P. Ex. 4        Psychological Testing Report

The hearing was adjourned at 5:30 p.m. and scheduled to reconvene on April 5, 2012.

During the second part of the hearing, the government called Special Agent Shelly

Rodriguez and admitted the following exhibits:

P. Ex. 5        CD: Recordings of June 20, 2010, and June 25, 2010, bomb threat
                calls

P. Ex. 6        Transcript of June 20, 2010, call

P. Ex. 7        Transcript of June 25, 2010, call

P. Ex. 8        FBI 302 report of interview of Latika Nelson

P. Ex. 9        Letter from U.S. Attorney's Office to Latika Nelson re: appointment
                of counsel

P. Ex. 10       Handwritten letter from Latika Nelson to Special Agent Shelly
                Rodriguez, FBI

P. Ex. 11       Handwritten letter from Latika Nelson to Special Agent Shelly
                Rodriguez, FBI

P. Ex. 12       Handwritten letter from Latika Nelson to "J.D. Steward," U.S.
                Attorney's Office

Due to a scheduling conflict, the hearing was again continued and set to

reconvene on April 23, 2012.  The hearing was concluded on April 23, 2012.

Subsequently, the parties filed briefs on the issue of the admissibility of lay opinion

testimony by Special Agent Rodriguez.

3

Transcripts of the above hearings were filed as document numbers 29, 34 and 36.

## I.    FINDINGS OF FACT

On August 11, 2011, Special Agent Shelly Rodriguez met with defendant whom she believed to be a witness in a case being investigated after bomb threats were made regarding the Kansas City International Airport (2Tr. at 11).[1]  Two calls had been made by an individual claiming that Roxanne Burnside planned to bomb an airplane or the airport.  Special Agent Rodriguez had hoped to locate Lavette Kelley, defendant's friend, who was a suspect at the time (2Tr. at 13).  During the initial conversation, Special Agent Rodriguez recognized defendant's voice as the one that had reported the bomb threats (2Tr. at 14).  Defendant admitted she had made calls to the police regarding Roxanne Burnside, she admitted having called Family Services regarding Roxanne Burnside, and she admitted having complained to an apartment manager about Roxanne Burnside (2Tr. at 14).  When defendant admitted having made the calls to the 311 Action Center about the airport bombs, she expressed remorse (2Tr. at 15). Defendant said that her friend Lavette Kelly was upset about a situation involving Roxanne Burnside, and so defendant wanted to do something to get back at Ms. Burnside (2Tr. at 15-16).

On September 20, 2011, Special Agent Rodriguez personally delivered a letter to defendant from the United States Attorney's Office advising defendant to call Pretrial

---

[1]"2Tr." refers to the transcript of the April 5, 2012, hearing (document number 34).

4

Services about getting a lawyer (2Tr. at 18; 3Tr. at 19).[2] When Special Agent Rodriguez arrived at defendant's residence, defendant asked if she was being taken to jail (2Tr. at 18). Special Agent Rodriguez gave the letter to defendant and told her to read it, and she said she would remain there until defendant read the letter so she could make certain defendant understood it (2Tr. at 18). Defendant appeared to read the letter and said she understood it, and Special Agent Rodriguez told defendant it was important for her to call the number in the letter to get an attorney (2Tr. at 19). Defendant did not read the letter out loud (3Tr. at 29). Defendant later wrote a letter to AUSA Dan Stewart, who is the person who signed the letter that was delivered to her (2Tr. at 21).

Special Agent Rodriguez believes, based on her dealings with defendant, that defendant understood she had done something wrong -- she had no problems communicating with defendant and defendant answered questions appropriately on both occasions that she spoke with Special Agent Rodriguez (2Tr. at 21; 3Tr. at 23). Special Agent Rodriguez believed that defendant seemed to understand what was being said to her, and she was very coherent and very alert (3Tr. at 29). Defendant understood that she was being investigated for criminal charges in connection with the calls she had made, and on several occasions she said she was sorry she had made the calls (2Tr. at 22; 3Tr. at 24-25). Defendant called the 311 Action Hotline which pertains to city services, one of which is the Aviation Department (2Tr. at 23). The call just happened to be recorded, but normally 311 Action calls are not recorded (2Tr. at

---

[2]"3Tr." refers to the transcript of the April 24, 2012, hearing (document number 36).

23). Defendant said on the call that she had told Ms. Burnside she was going to "call the feds" which led Special Agent Rodriguez to conclude that defendant was aware that making a bomb threat is a federal crime (2Tr. at 23). In the previous calls about Ms. Burnside, defendant had called the police rather than the 311 Action line, indicating to Special Agent Rodriguez that defendant knew there was a difference between certain actions and crimes (2Tr. at 23). Based on her communications with defendant, Special Agent Rodriguez was not aware that defendant was mentally retarded (2Tr. at 29; 3Tr. at 3). Special Agent Rodriguez has no special training dealing with mental retardation or mental health issues (3Tr. at 3).

Defendant filed a motion for judicial determination of mental competency and was thereafter examined by Dr. Wisner. Dr. Wisner reviewed the indictment, investigative reports and transcripts of statements, transcripts of the 311 calls that were made in this case, defendant's medical records, and some of defendant's school records (1Tr. at 10-11).[3] Defendant's medical records included an evaluation by Dr. Ronald Holzschuh dated June 24, 2008, in which he diagnosed her with mild mental retardation, dependent personality disorder and adjustment disorder with depressed mood (1Tr. at 11-12). The records included an evaluation by Dr. Keith Allen from 2006 in which he made findings consistent with Dr. Holzschuh's findings, including borderline intellectual functioning, dysthymic disorder[4] and personality disorder with paranoid

---

[3]"1Tr." refers to the transcript of the March 28, 2012, hearing (document number 29).

[4]Dysthymia is a chronic type of depression in which a person's moods are regularly low; however, symptoms are not as severe as with major depression.

6

features (1Tr. at 12-13). Dr. Wisner's February 10, 2012, report, which was incorporated as his direct testimony at the March 28, 2012, hearing, includes the following observations:

Defendant stated that she was angry and upset with RB. She stated at first that she made the phone calls at issue in this case not thinking that anything would happen to RB. However, she subsequently admitted that she indeed thought RB would "get in trouble." One of the reasons for her ill feelings toward RB was that years earlier RB reported defendant to the Division of Family Services about her children so as to get defendant in trouble.

Defendant then stated that she believed RB and Ms. Kelly "planned the whole affair" in order to get back at defendant because they were jealous of the income defendant receives by way of disability checks to her children.

Although defendant was in special education classes her entire school career, she graduated from high school and then earned a CNA certificate at Penn Valley Community College. She has never been able to pass a driver's test. Defendant held various CNA positions, her longest being one year. She last worked in 1996. She stated that she either quit in frustration or was fired from her jobs because they did not have the patience to teach her or they thought she was slow to learn.

Defendant has never been married but has been in a relationship for 19 years and has three children, ages 20, 17, and 7. All three of her children receive social security disability income.

Defendant was first diagnosed with depression in 2006 when she was involved in an abusive relationship and lived in a battered women's shelter. In 2010 she was

7

diagnosed with Adjustment Reaction with Depressed Mood. Defendant takes Trazodone,[5] Abilify,[6] Zoloft,[7] Risperdal,[8] and Hydroxyzine.[9] She reported using crack cocaine from the age of 24 until age 39 when she participated in substance abuse treatment. She has been abstinent since 2006. I note here that defendant told Dr. Poje that her last use of crack cocaine was "approximately 1 year ago," resulting in a discrepancy of approximately five years with regard to her use of crack cocaine (1Tr. at 72).

During the Mental Status Examination by Dr. Wisner, defendant was cooperative with the exam and answered questions in a complete and spontaneous fashion. She was oriented to time, place, date and the current situation. She did not appear to Dr. Wisner to be preoccupied and had no difficulty focusing or switching her attention as required. "She had difficulty comprehending some abstract terms and her vocabulary was approximately at an early elementary school level-- so that at times she seemed confused by the line of questioning[; however, her] speech was overall coherent and logical." She had difficulty understanding abstract concepts for the most part, but her remote and recent memory appeared to Dr. Wisner to be intact.

With regard to understanding the charges and trial process, Dr. Wisner wrote:

---

[5]A serotonin modulator used to treat depression.

[6]Treats schizophrenia.

[7]A selective serotonin reuptake inhibitor used to treat depression.

[8]Treats schizophrenia.

[9]Treats anxiety.

8

Ms. Nelson exhibited some confusion in her ability to determine just what was wrong about her conduct in providing false information. She repeatedly stated that what she did was wrong "because it was the government." Furthermore, Ms. Nelson was unable to explain why her behavior in making the bomb threat phone calls were wrong except to say that "because it was the government and it is illegal to give false information." This last response appeared almost rote memorization of what she has likely been told by others. She could not venture a guess as to why an act might in fact be illegal.

She however was able to describe the charges as well as the general nature and some specifics of the evidence . . . against her. She understands the roles of her defender [and the] prosecuting attorney. She had difficulty distinguishing the roles of the judge and jury.

She could describe the factors she would consider when deciding how to act on the advice of her attorney, possible benefits of "plea bargaining," and the consequences by way of sentencing if determined to be guilty. She understands the nature of evidence and has a limited idea about the role of the Trier of fact. There was no evidence in this examination (or suggested by her history and records reviewed) that she might suffer from reduced reality testing or any other form of psychosis. . . . I could detect no thinking pattern or current illness which reduces her ability to work with her attorney and assist in her defense. However she appeared to have difficulty acquiring and using new information, dealing with unfamiliar concepts, and arriving at accurate conclusions during the interview.

In view of her apparent low intellectual capacity, and particularly her difficulty acquiring and using new information to reach conclusions -- psychological assessment using standardized testing was requested and subsequently performed.

Dr. Wisner diagnosed adjustment reaction[10] with depressed mood, history of

cocaine abuse (currently abstinent and in remission), mental retardation, and cognitive

---

[10]Adjustment "disorder" is a short-term condition that occurs when a person is unable to cope with, or adjust to, a particular source of stress, such as a major life change, loss, or event. Because people with adjustment disorders often have symptoms of depression, such as tearfulness, feelings of hopelessness, and loss of interest in work or activities, adjustment disorder is sometimes called "situational depression." Unlike major depression, however, an adjustment disorder is triggered by an outside stress and generally goes away once the person has adapted to the situation. http://www.webmd.com/mental-health/mental-health-adjustment-disorder. See also 1Tr. at 15-16.

disorder not otherwise specified (deficits in abstraction and acquisition of information). In his opinion section of the report, Dr. Wisner stated that defendant has chronic difficulty perceiving the "larger pattern" and deriving general principles from pieces of information. She has a reduced ability to apply general principles to isolated instances of behavior or bits of information. Her learning is slow and usually incomplete, requires repetition, and is unlikely to be applied to novel circumstances. Dr. Wisner believes that defendant's interpretation of "illegality" likely means "I could get in trouble for..." He believes defendant perceives the world as centered on or only as affecting herself, and that her trying to get a former friend in trouble could have been done without the awareness of the "larger issue of lying, falsely informing law enforcement and public safety agencies, etc."

Dr. Wisner then concludes that defendant "lacked the capacity to form a criminal intent in making false statements as she is accused of doing on or about June. My finding is of a state of reduced capacity to form a criminal intent." He went on to describe her knowledge of right from wrong, her capacity to form criminal intent, etc.

As for defendant's competency to stand trial, Dr. Wisner wrote:

Latika Nelson is able to recite the charges against her. She is unclear about the extent of sentencing should she be found guilty. She has a very simple understanding of the role of legal counsel, and somewhat less so that of the judge, the jury, or the prosecutor; however in my opinion she can understand the very basic functions of the trial process itself.

Due to Ms. Latika Nelson's borderline intellectual functioning she will have some difficulty grasping the full import of a entering a plea, and more so the effect of a plea bargain and its potential future ramifications. She is only able to understand the "black and white" nature of a plea bargain. That is if she is found guilty she will go to jail, if she pleads guilty she will "get probation and not go to jail". She could not describe the additional burden of parole, probation, suspended sentencing or diversion.

10

On the basis of all of the above, it is my professional opinion, held with reasonable medical certainty, that Ms. Latika Nelson is able to have a basic appreciation of the charges against her, the black and white consequences of a guilty verdict, and is able to cooperate with her attorney. She appears to understand the basic proceedings in a criminal trial. Conditional outcomes (parole, probation, suspended sentencing or diversion) will be more difficult for her to comprehend but patient and careful explanation should assist in overcoming this potential lack of understanding.

There are no indications that her mental condition is other than stable.

In Dr. Wisner's experience, there is not normally much of a variation in impairments such as memory, verbal skills, and reasoning ability when one is mentally retarded (1Tr. at 5). Because defendant was able to accomplish education and training, he detected some "scatter" and requested that Dr. Poje conduct additional testing (1Tr. at 5, 47). He was concerned about additional or other deficits in her cognitive abilities that may not be as readily apparent on a simple confrontational examination (1Tr. at 5-6). Dr. Poje spoke to defendant; but the psychological tests were administered by a psychometrician, and then Dr. Poje interpreted the tests and prepared a report for Dr. Wisner (1Tr. at 47, 48). Dr. Poje did not review any of the documentation that was reviewed by Dr. Wisner (1Tr. at 48-49). Dr. Poje has assisted Dr. Wisner in this manner with approximately four to six individuals -- that is the extent of his experience in forensic analysis for court purposes (1Tr. at 49, 78-79). He has never assisted Dr. Wisner in an evaluation to determine capacity to stand trial and assist in one's defense (1Tr. at 79, 89).

Dr. Poje's report, which was relied upon by Dr. Wisner, tested defendant's reading ability, intellectual functioning, short-term and long-term memory, and motor functioning. He found that defendant's full scale IQ is 66 which falls in the mild mental

11

retardation range. He diagnosed cognitive disorder not otherwise specified, rule out fetal alcohol syndrom, history of cocaine abuse, borderline intellectual functioning, and a global assessment of functioning ("GAF") of 40 to 45. A GAF of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Dr. Poje's recommendation is as follows:

> The current evaluation finds an individual with such cognitive difficulty that it is unlikely that her recent legal difficulties were intentional in terms of criminal intent (e.g., lacking "mens rea"). Furthermore, these deficits render it unlikely that she has capacity to effectively stand trial.
>
> When interviewed regarding her current legal circumstances, Ms. Nelson indicated that she performed this action (e.g., allegedly reported a potential threat to KCI) in order to get Ms. Burnside into "trouble." During our clinical interview, she had difficulty understanding the crime that she was being accused of and tended to answer questions regarding this issue in a very concrete and simplistic manner. There was no evidence of any intention, means or plan to carry out such an action, and very limited evidence that Ms. Nelson fully understands her current circumstances.
>
> Therefore, in summary, the present evaluation would recommend primarily that Ms. Nelson be considered as an individual with impaired intellectual and cognitive ability when interpreting her legal status.

Dr. Wisner explained that an "adjustment reaction with depressed mood" is something that generated a mental health encounter (1Tr. at 15). Defendant's situational depression was brought about by being under indictment, which would upset most people but would probably give defendant more difficulty to deal with than someone who has better coping skills (1Tr. at 16). Dr. Wisner did not observe in defendant any evidence of a major depressive disorder or anything that would require ongoing or significant treatment of depressive illness (1Tr. at 17). "She isn't going to benefit from a pill. Treatment is not going to be an issue." (1Tr. at 17).

12

Concepts that are not readily black and white and easily discernible are very difficult for defendant to understand or consider (1Tr. at 20). Evaluating a concept such as going to trial and pursing a defense of diminished capacity would be difficulty for defendant just on first presentation (1Tr. at 20). But because the concept of diminished capacity can be defined in pretty concrete terms, it would not be beyond defendant's understanding (1Tr. at 21). In order for her to evaluate whether or not to pursue that as a possible defense, it would have to be presented with some explanation (1Tr. at 21). However, "I believe she could come to understand that and make a decision about it." (1Tr. at 21). Defendant has difficulty perceiving a larger pattern and deriving general principles from pieces of information (1Tr. at 25). Despite defendant's condition, Dr. Wisner believes that she can comprehend hypothetical, conditional outcomes (1Tr. at 28). Dr. Wisner acknowledged that defendant would have difficulty with it,[11] but "on a good day" she can do it (1Tr. at 29).

Defendant understands the roles of a defense attorney and prosecutor (1Tr. at 30). She has difficulty understanding the roles of judge and jury, understanding who exactly decides if a person "did it or didn't." (1Tr. at 30). As far as understanding hypotheticals that might result in parole, probation, suspended sentencing, diversion,

---

[11]Dr. Wisner explained that defendant falls in the "middle" by describing examples of black and white: "[I]f I evaluate somebody who's consistently crafty and clever and two steps ahead of me with every question that I ask, yeah, in the extreme, I don't have much question about their ability to hold their own, help their lawyer, have a fair shake in a courtroom. Someone who is literally staring and drooling, I mean, and walking into the walls, I mean, that obviously, there's not much question there. . . . [T]here's not a medical measurement that I can use that says, you know, that the numbers have been crunched and they fall out and it says competent and another set of numbers fall out and say not competent." (1Tr. at 29).

and the effects on her life of being placed on probation or parole, defendant can understand those things but it would not be enough to merely use the words and say, "Do you understand?" (1Tr. at 30-31). "[Y]ou've got to try to work at eliciting how well it's understood." (1Tr. at 31). When running through the list of potential defenses that defendant could raise, it will be difficult but not impossible for her to consider those defenses and evaluate them and decide what direction to proceed -- "with patience it could be done" (1Tr. at 32, 35, 37). He concluded that despite all the various aspects of his report, that defendant has the mental competency to stand trial (1Tr. at 36).

Dr. Wisner recommended that as the case proceeds, defense counsel request breaks and make sure defendant understands what is going on (1Tr. at 39). If she appears to "tune out" it will be "reasonably obvious" (1Tr. at 39).

Psychologist Dr. Poje testified that "people" with the types of deficits found in defendant's test scores "typically have problems when they encounter new situations"[12] (1Tr. at 60). Dr. Poje does not believe defendant's ability in this respect will improve -- "I think that these are going to be stable aspects of her psychological profile." (1Tr. at 61). Because of defendant's cognitive dysfunction, Dr. Poje "anticipate[d] that a person with that type of psychological profile would lack capacity to . . . effectively stand trial" (1Tr. at 65). Dr. Poje believes that when dealing with defendant, one will have to "discuss the issues forward and backward." (1Tr. at 67).

Although Dr. Wisner did not ask Dr. Poje for his opinion of whether defendant was competent to stand trial, he took it upon himself to include his opinion on that issue

_____

[12]This is a general statement about others who have had test scores similar to defendant's.

14

in his report to Dr. Wisner (1Tr. at 68-69).  Dr. Poje has not reviewed Dr. Wisner's report

on defendant's competency (1Tr. at 69).  Dr. Poje did not read the transcripts of the

calls defendant is alleged to have made in regard to blowing up the airport (1Tr. at 71).

Dr. Poje does not know what the legal standard is for determining competence to stand

trial (1Tr. at 69).  Dr. Wisner did not ask Dr. Poje to provide an opinion as to whether

defendant could have formed the criminal intent to commit the crimes with which she is

charged; however, he decided to include that in his report as well (1Tr. at 70).  His

opinion that defendant did not have the ability to form criminal intent is based on his

belief that she did not have the "intention of doing anyone any harm involved with the

airport, Kansas City, Missouri, civilians to the United States." (1Tr. at 73).  Dr. Poje does

not know whether, as a matter of law, one has to be able to carry out a threatened

offense in order to have criminal intent (1Tr. at 73).  Dr. Poje has not read the statute

which describes what defendant is charged with (1Tr. at 73).  He agrees with Dr. Wisner

that defendant voluntarily and intentionally made the false bomb threat calls (1Tr. at 74).

Defendant gave conflicting information to Dr. Wisner and Dr. Poje about how long ago

she had stopped using crack cocaine, and she gave conflicting information about

whether she suffered from auditory or visual hallucinations (1Tr. at 74-75).

## II.   OPINIONS OF SPECIAL AGENT RODRIGUEZ AND DR. POJE

Defendant objected to the court relying on the opinion of Special Agent Shelly

Rodriguez, and the government objected to the opinion of Albert Poje, Ph.D.[13]  The

---

[13]The government does not object to the test results in Dr. Poje's report and
testimony; rather, the government objects to Dr. Poje's conclusion that defendant is not
competent to stand trial and could not have formed the mental intent to commit the
offense, the latter an issue that is not before the court at this time.

15

government argues that Special Agent Rodriguez's opinion is admissible pursuant to Federal Rule of Evidence 701 dealing with opinion testimony by lay witnesses. Defendant argues that Dr. Poje's opinion is admissible, and she argues that Dr. Wisner's opinion should not be relied upon because it is not supported by his findings.

**Special Agent Shelly Rodriguez**

Federal Rule of Evidence 701 states as follows:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a)     rationally based on the witness's perception;
>
> (b)     helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c)     not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Although the Eighth Circuit has not addressed the issue of lay opinion testimony on the issue of mental competence to stand trial, other courts have held that such evidence can be considered.  In United States v. Mitchell, 706 F. Supp. 2d 1148, 1151 (D. Utah 2010), the court held that in determining a defendant's competency to stand trial, a court may rely on, in addition to expert testimony, lay witness testimony concerning the defendant's rational behavior.  See also United States v. Birdsell, 775 F.2d 645, 650-651 (5th Cir. 1985); United States v. Mota, 598 F.2d 995, 998-1000 (5th Cir. 1979); United States v. Gigante, 925 F. Supp,. 967, 976 (E.D.N.Y. 1996); Bundy v. Dugger, 675 F. Supp. 622, 634 (M.D. Fla. 1987).

The Eighth Circuit's position on lay opinion testimony to prove the issue of sanity is in accord with the cases cited above.  In United States v. Dresser, 542 F.2d 737, 742

(8th Cir. 1976), the court held that "lay testimony can be sufficient to satisfy the prosecution's burden of proving a defendant's sanity, even though there is expert testimony to the contrary" citing Dusky v. United States, 295 F.2d 743, 754 (8th Cir. 1961), cert. denied, 368 U.S. 998 (1962). In Mason v. United States, 402 F.2d 732, 738 (8th Cir. 1968), the court held that the testimony of lay witnesses for the government "was properly limited to observations gleaned in their contact with Mason. . . . The collective thrust of their testimony indicated that Mason looked and behaved as a person deserving of pity, but possessing the ability to control his actions and to distinguish right from wrong."

There are other cases not on point but persuasive on the issue. For example, in Farfaras v. Citizens Bank an Trust of Chicago, 433 F.3d 558, 565-566 (7th Cir. 2006), the court held that in an employment action alleging, among other things, intentional infliction of emotional distress, a lay witness was properly permitted to testify that the plaintiff appeared "depressed" -- the testimony was reasonably based on the witness's perception and there was nothing in the record to indicate that the witness was offering a clinical or professional evaluation. In United States v. Smith, 591 F.3d 974, 982-983 (8th Cir. 2010), a forensic examiner interviewed an eight-year-old child about being sexually molested. The child testified differently at trial than she did during the interview with the forensic examiner who then testified that in her opinion inconsistencies in the statements by child sexual abuse victims is normal and she regards them as gradual admissions rather than true inconsistencies.[14] The Eighth Circuit held that perceptions

---

[14]The forensic examiner was asked, "Yesterday [B.R.] testified that [Smith] inserted his finger inside her vagina on two occasions, not just one occasion. In your

based on industry experience are a sufficient foundation for lay opinion testimony, citing

US Salt, Inc. v. Broken Arrow, Inc., 563 F.3d 687, 690 (8th Cir. 2009), so long as the lay

witness's opinion is not based on scientific, technical, or other specialized knowledge

within the scope of Federal Rule of Evidence 702.

Here, Special Agent Rodriguez's opinion that defendant was acting competently

during the two encounters with Special Agent Rodriguez is rationally based on her

perception and is not based on scientific, technical or other specialized knowledge.  As

was the case in United States v. Smith, this agent relied on her industry experience as a

federal agent and her personal contacts with the defendant to form her opinion that

defendant appeared to be competent at the time of those meetings.

Special Agent Rodriguez's opinion that plaintiff called the 311 Action Center

because it would not likely be recorded, that plaintiff knew it was a federal crime to

make such a call because she stated on one of the recorded calls that she was going to

call the "feds," that she could read and understand the target letter because she called

Pretrial Services about a lawyer like the letter recommended, are not properly relied

---

experience is that an inconsistent statement?"  The forensic examiner answered, "In my
experience I would not consider it an inconsistent statement and the reason that I
wouldn't is kids make disclosures over a period of time. And so when a child comes in
and does an interview with me and they do not make a disclosure I may only get a tiny
part of it. And then as they are able to mature a little bit if they receive counseling in a
supportive environment more details of what occurred to them may come out. And so
it's not a one-time thing. It's a process for kids." United States v. Smith, 591 F.3d at
978.

upon as lay opinion testimony because those conclusions are not based on the witness's perception but rather things the witness was told.

Therefore, I conclude that Special Agent Rodriguez's opinion -- based on her observations of defendant's actions, statements, and ability to communicate and answer questions appropriately during the meetings with Special Agent Rodriguez -- is relevant insofar as it corroborates Dr. Wisner's opinion that defendant has a basic appreciation of the charges against her and can understand, with explanation, the proceedings in which she is involved.

**Albert Buddy Poje, Ph.D.**

When expert testimony is offered, the court must ensure that it meets the requirements of Federal Rule of Evidence 702.[15]  General Electric Co. v. Joiner, 522 U.S. 136 (1997).  The party offering opinion testimony must prove the witness is qualified to testify and that the testimony is admissible by a preponderance of evidence. Bourjaily v. United States, 483 U.S. 171, 175-176 (1987).  The district court has wide discretion in determining whether to admit or exclude the testimony. General Electric Co. v. Joiner, 522 U.S. at 142-143.

Under Federal Rule of Evidence 702, an expert's knowledge, skill, experience, training, or education must be sufficient to assist the trier of fact; and the area of the

_____

[15]F.R.E. 702: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

witness's competence must match the subject matter of the witness's testimony. Robinson v GEICO Gen. Ins. Co., 447 F.3d 1096, 1101 (8th Cir. 1006). "[T]here are many different kinds of experts, and many different kinds of expertise." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999). The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas. Shreve v. Sears, Roebuck, & Co., 166 F. Supp. 2d 378, 391 (D. Md. 2001); Oglesby v. General Motors Corp., 190 F.3d 244, 247 (4th Cir. 1999); Wilson v. Woods, 163 F.3d 935, 938 (5th Cir. 1999); Ancho v. Pentek Corp., 157 F.3d 512, 517 (7th Cir. 1998); Bogosian v. Mercedes-Benz of North America, 104 F.3d 472, 476 (1st Cir. 1997); Trumps v. Toastmaster, Inc., 969 F. Supp. 247, 252 (S.D.N.Y. 1997); Silva v. American Airlines, Inc., 960 F. Supp. 528, 531 (D.P.R. 1997); Diviero v. Uniroyal Goodrich Tire Co., 919 F. Supp. 1353, 1356-57 (D. Ariz. 1996), aff'd, 114 F.3d 851 (9th Cir. 1997).

In this case, Dr. Poje was asked to perform psychological testing to assist Dr. Wisner with his determination of whether defendant is competent to stand trial. His testing and the conclusions dealing with defendant's reading ability, intellectual functioning, short- and long-term memory, and motor functioning are within his area of expertise and were the type of opinion normally relied on by Dr. Wisner when determining whether someone is competent to stand trial. However, Dr. Poje's opinions that defendant is not competent to stand trial and assist in her own defense and that she was incapable of forming the requisite intent to commit the crime are not within his area of expertise and will not be relied upon here.

Dr. Poje did not review any of the documentation that was reviewed by Dr. Wisner -- the indictment, investigative reports, transcripts of statements, transcripts of

20

the 311 calls that were made in this case, defendant's medical records, and defendant's school records. Dr. Poje's experience with forensic analysis for court purposes is limited to four to six individuals, and none of those dealt with evaluating a person to determine capacity to stand trial and assist in one's defense. Had Dr. Poje been familiar with the legal standard for competency to stand trial, I may have been able to rely on his testimony, as the courts routinely rely on psychologists to make competency determinations. However, in this case, Dr. Poje did not have sufficient familiarity with the legal standard for competency and therefore his opinion cannot be relied upon.

Dr. Poje concluded, based on defendant's cognitive dysfunction, that she is not competent to stand trial. However, this conclusion is contrary to law, as discussed in the next section below, as cognitive dysfunction alone is not a basis for finding someone incompetent to stand trial. Dr. Poje's opinion that defendant did not have the ability to form criminal intent (an issue not before me, but testified about) is based on his belief that she did not have the intent to harm anyone at the airport. This opinion would not be admissible even if Dr. Poje had been qualified as an expert in this area, because there is no requirement that defendant have such an intent to be convicted of the crimes with which she is charged. Defendant is not charged with threatening to bomb the airport or an airplane, she is charged with conveying false information about a threat, knowing the information was false. 18 U.S.C. § 844(e) states as follows:

> Whoever, through the use of the . . . telephone, . . . maliciously conveys false
> information knowing the same to be false, concerning an attempt or alleged
> attempt being made, or to be made, to kill, injure, or intimidate any individual or

21

unlawfully to damage or destroy any building, vehicle, or other real or personal property by means of fire or an explosive shall be imprisoned for not more than 10 years or fined under this title, or both.

Dr. Poje admitted that he had not read the statute which describes what defendant is charged with; he admitted that he does not know whether one has to be able to carry out a threatened offense in order to have criminal intent; and despite his opinion that defendant is not competent and did not have the requisite criminal intent, he agreed with Dr. Wisner that defendant voluntarily and intentionally made the false bomb threat calls, which contradicts his finding that defendant could not have formed the requisite criminal intent.

## III.     DEFENDANT'S COMPETENCY TO PROCEED

Determining whether a defendant is competent to stand trial is committed to the discretion of the district court.  United States v. Denton, 434 F.3d 1104, 1112 (8th Cir. 2006).  Absent a contrary indication, the defendant is presumed to be competent.  Id. "The burden rests with the defendant to demonstrate that he was not competent to stand trial."  Id.; United States v. Jimenez-Villasenor, 270 F.3d 554, 559 (8th Cir. 2001). So long as a defendant can consult with his lawyer with a reasonable degree of rational understanding and has a rational and factual understanding of the proceedings against him, he will be found competent.  United States v. Denton, 434 F.3d at 1112; United States v. Robinson, 253 F.3d 1065, 1067 (8th Cir. 2001).

Finding that a defendant suffers from a mental deficiency does not automatically lead to the conclusion that the defendant is incompetent -- "not every manifestation of mental illness demonstrates incompetence."  United States v. Ghane, 593 F.3d 775, 779 (8th Cir. 2010); Vogt v. United States, 88 F.3d 587, 591 (8th Cir. 1996).  In United

22

States v. Robinson, 253 F.3d 1065, 1067 (8th Cir. 2001), the defendant was found to be mildly mentally retarded, and his condition was unlikely to improve. After he went through educational classes focusing on the criminal justice system, he was found competent to stand trial. In Medina v. Singletary, 59 F.3d 1095, 1106-1107 (11th Cir. 1996), the court found that "neither low intelligence, mental deficiency, nor bizarre, volatile and irrational behavior can be equated with mental incompetence to stand trial." (cited with approval by the Eighth Circuit in Vogt v. United States, 88 F.3d 587, 591 (8th Cir. 1996)).

In this case, the only reliable evidence of defendant's competence besides Special Agent Rodriguez's opinion that defendant was able to competently participate in an interview, understand questions, and answer questions appropriately, is the opinion of Dr. Wisner who found that defendant is competent to proceed but will probably require extra explanation. Additionally, Dr. Wisner believes that defense counsel and the court will not be able to simply ask defendant if she understands something -- they will need to essentially dig deeper in the inquiry to make certain she does understand as opposed to her merely saying she does. Although defendant points out that Dr. Wisner said defendant falls into the "Twilight Zone," his explanation of this is that very few people are "black or white" and defendant is one of those who falls in the middle:

> [I]f I evaluate somebody who's consistently crafty and clever and two steps ahead of me with every question that I ask, yeah, in the extreme, I don't have much question about their ability to hold their own, help their lawyer, have a fair shake in a courtroom. Someone who is literally staring and drooling, I mean, and walking into the walls, I mean, that obviously, there's not much question there. . . . [T]here's not a medical measurement that I can use that says, you know, that the numbers have been crunched and they fall out and it says competent and another set of numbers fall out and say not competent.

23

(1Tr. at 29).

Although it will be difficult for defendant to understand the list of potential defenses she can raise, evaluate them and decide which to use, "with patience it can be done." Dr. Wisner concluded that despite all the various aspects of his report, the bottom line is that defendant has the mental competency to stand trial and that if during the proceedings she tunes out, it will be "reasonably obvious." He testified that regularly requesting breaks in the proceedings to make sure defendant knows what is going on will help prevent any tuning out by defendant.

As discussed above, this conclusion is supported by the lay opinion and personal observations of Special Agent Rodriguez -- although defendant may not have read or understood what was in the target letter she was given, she understood enough to call Pretrial Services about a lawyer after Special Agent Rodriguez told her it was important that she do so. She understood that the FBI was investigating a criminal offense because when Special Agent Rodriguez showed up the second time, defendant's first response was to ask whether she was being taken to jail. Defendant has freely admitted that she lied about the bomb threats in order to get Roxanne Burnside in trouble, which is evidence that defendant knew she was doing something wrong.

## IV.    CONCLUSION

Based upon the evidence discussed above, I find that the defendant is competent to stand trial and to assist in her defense. Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and applicable law, enter an order finding defendant competent to stand trial and to assist in her defense. It is further

ORDERED that any objections to this Report and Recommendation shall be filed by August 1, 2012.

                                        /s/ Robert E. Larsen
                                    ROBERT E. LARSEN
                                    United States Magistrate Judge

Kansas City, Missouri
July 18, 2012